**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., MOTHER | : | No. 2534 EDA 2017 |

Appeal from the Decree July 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000489-2017,
CP-51-DP-0002974-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., MOTHER | : | No. 2536 EDA 2017 |

Appeal from the Decree July 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000490-2017,
CP-51-DP-0002975-2015

BEFORE:  BOWES, J., LAZARUS, J., and RANSOM, J.

MEMORANDUM BY RANSOM, J.:                    **FILED FEBRUARY 07, 2018**

T.B. ("Mother") appeals from the decrees entered July 17, 2017, in the

Court of Common Pleas of Philadelphia County, which involuntarily terminated

her parental rights to her minor sons, L.B., born in October 2014, and A.B.,

born in September 2015 (collectively, "the Children").[1] Mother also appeals from the order entered that same day, which changed the permanent placement goal of A.B. to adoption. Additionally, Mother's counsel filed a motion to withdraw and brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). Upon review, we grant counsel's motion to withdraw and affirm the decrees and order.

The trial court summarized the relevant factual and procedural history of this matter as follows.

> . . . . The Philadelphia Department of Human Services ("DHS") first became aware of this family on September 27, 2015 when it received a General Protective Services ("GPS") report concerning allegations that Mother, while pregnant with A.B., tested positive for marijuana at one of her two prenatal visits. The GPS report also alleged that Mother had mental health issues. The report was determined to be valid, and the Community Umbrella Agency ("CUA") placed in-home services in the home and put a safety plan in place. In November 2015, DHS received a Child Protective Services ("CPS") report concerning allegations of abuse against L.B. The CPS report was validated and indicated Mother as the alleged perpetrator. Based on the allegations in the CPS report, the Children were removed from the home on November 14, 201[5].
>
> Following a shelter care hearing for the Children on November 16, 2015, the Honorable Glynnis Hill granted temporary legal custody to DHS and allowed Mother to have supervised visits

---

[1] The trial court entered a separate decree that same day, terminating the parental rights of A.B.'s putative father, D.M. The court entered an order denying termination with respect to L.B.'s putative father, A.W. The court also entered decrees terminating the parental rights of any unknown fathers that the Children may have. Neither, D.M., nor any unknown father, appealed the termination of his parental rights.

with the Children at the agency. Following the shelter care hearing, DHS filed dependency petitions for the Children based on the information discussed *supra*. Judge Hill subsequently held an adjudicatory hearing on November 24, 2015 and adjudicated the Children dependent based on Mother's present inability. At the adjudicatory hearing, Judge Hill discharged the temporary commit[ment] and granted full legal and physical custody of the Children to DHS. An initial permanency review hearing was held on February 24, [2016], at which time the goal was identified as reunification.

Trial Court Opinion, 9/1/2017, at 1-2 (citations to the record omitted).

On April 28, 2017, DHS filed petitions to involuntarily terminate Mother's parental rights to the Children, and to change the Children's permanent placement goals to adoption. The trial court conducted a combined termination and goal change hearing on July 17, 2017.[2] Following the hearing, the court entered decrees terminating Mother's parental rights to both Children, and entered an order changing A.B.'s goal to adoption.[3] Mother timely filed notices of appeal on August 3, 2017, along with statements of counsel's intent to file an **Anders** brief pursuant to Pa.R.A.P. 1925(c)(4).[4] Counsel filed an **Anders** brief on October 2, 2017, and filed a motion to withdraw on October 3, 2017.

---

[2] The Honorable Daine Grey, Jr., presided over the hearing.

[3] The docket reflects that the trial court subsequently amended its goal change order to include a provision vacating the appointment of A.B.'s counsel.

[4] Mother indicated in her notices of appeal that she was also appealing the order changing J.B.'s permanent placement goal to adoption. While the trial court entered a permanency review order with respect to J.B. on July 17, 2017, the order maintained his prior goal of return to parent or guardian.

Before reaching the merits of Mother's appeal, we must address counsel's motion to withdraw. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)). This Court extended the *Anders* procedure to appeals from decrees involuntarily terminating parental rights in *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992). To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)). With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an *Anders* brief must comply with the following requirements:

(1) provide a summary of the procedural history and facts, with citations to the record;
(2) refer to anything in the record that counsel believes arguably supports the appeal;
(3) set forth counsel's conclusion that the appeal is frivolous; and
(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

In the instant matter, Mother's counsel filed a motion to withdraw, certifying that she reviewed the case and determined that Mother's appeal is frivolous. Counsel also filed a brief, which includes a summary of the history and facts of the case, potential issues that could be raised by Mother, and counsel's assessment of why those issues are frivolous, with citations to relevant legal authority. Counsel provided Mother with a copy of the brief, and with a letter advising her that she may obtain new counsel or raise additional issues *pro se*.[5] Accordingly, counsel complied with the requirements of **Anders** and **Santiago**. We may therefore proceed to review the issues outlined in the **Anders** brief. In addition, we must "conduct an independent review of the record to discern if there are any additional, non-

---

[5] Counsel initially failed to attach a **Millisock** letter to her motion to withdraw. On October 10, 2017, this Court entered a *per curiam* order, directing counsel to file a **Millisock** letter within fourteen days. We also directed Mother's counsel to file a certificate of service, indicating that she served the **Anders** brief on Mother. Counsel complied by filing the letter and certificate on October 11, 2017.

- 5 -

frivolous issues overlooked by counsel." ***Commonwealth v. Flowers***, 113

A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's **Anders** brief raises the following claim for our review. "Did

the trial court commit an error of law and abuse of discretion by involuntarily

terminating [Mother's] parental rights?" **Anders** brief at 2.

We review this claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated

analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

- 7 -

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court found that Mother is incapable of parenting the Children and that she will not remedy her parental incapacity. Trial Court Opinion, 9/1/2017, at 8-9. The court reasoned that Mother failed to comply with her Single Case Plan ("SCP") objectives. *Id.* at 8.

In response, Mother argues that the trial court's decision resulted from ineffective assistance of counsel. *Anders* brief at 8-10.[6] This Court has

---

[6] Mother's counsel on appeal is not the same counsel who represented her during the hearing.

discussed claims of ineffective assistance of counsel in termination matters as follows.

> In the context of a termination proceeding, the best approach to suggest itself is the fundamental fairness doctrine whereby, in the exercise of its broad scope of review, an allegation of ineffectiveness of counsel on appeal would result in a review by this Court of the total record with a determination to be made whether on the whole, the parties received a fair hearing, the proof supports the decree by the standard of clear and convincing evidence, and upon review of counsel's alleged ineffectiveness, any failure of his stewardship was the cause of a decree of termination. Mere assertion of ineffectiveness of counsel is not the basis of a remand or rehearing, and despite a finding of ineffectiveness on one or more aspects of the case, if the result would unlikely have been different despite a more perfect stewardship, the decree must stand.

*In re Adoption of T.M.F.*, 573 A.2d 1035, 1044 (Pa. Super. 1990) (*en banc*) (plurality); *see also In re K.D.*, 871 A.2d 823, 829 (Pa. Super. 2005), *appeal denied*, 889 A.2d 1216 (Pa. 2005) (explaining in the context of a goal change appeal that an appellant must "show by clear and convincing evidence that it is more likely than not that the result would have been different absent the ineffectiveness[.]").

After careful review, we conclude that the record supports the trial courts findings, and that the court's decision did not result from ineffective assistance of counsel. During the termination and goal change hearing, DHS presented the testimony of CUA case manager, Agnieska Feulner. Ms. Feulner testified that Mother's SCP objectives included finding affordable housing, participating in and completing drug and alcohol treatment, complying with

random drug screens, addressing mental health concerns, attending parenting classes, completing a parenting capacity evaluation, attending anger management, and attending weekly visits with the Children. N.T., 7/17/2017, at 8.

Concerning Mother's compliance with these objectives, Ms. Feulner testified that CUA referred Mother to the Achieving Reunification Center ("ARC") for housing, parenting, financial education, and anger management. *Id.* However, ARC discharged Mother unsuccessfully after she "verbally attacked" and "physically tried to punch" her ARC case manager. *Id.* at 9. Mother did not complete a housing program anywhere else, and did not have housing at the time of hearing. *Id.* Regarding her drug and alcohol objective, Mother enrolled in a treatment program, but then failed to comply with treatment. *Id.* at 8. Mother also missed four recent drug screens, and failed to complete a parenting capacity evaluation. *Id.* at 8, 15. Finally, regarding mental health, Ms. Feulner testified that Mother was involuntarily committed to a mental hospital from June 9, 2017, until June 21, 2017. *Id.* at 16. During her commitment, Mother was diagnosed with schizoaffective disorder bipolar type. *Id.* Mother is currently enrolled in mental health treatment, but Ms. Feulner was unsure whether Mother attends treatment regularly. *Id.* at 15-16.

Ms. Feulner acknowledged that Mother did make some progress, by completing a parenting program and anger management at Turning Points for

Children in May 2017. *Id.* at 9-10. However, despite completing anger management, Mother continues to engage in angry and threatening behavior. *Id.* at 10. Ms. Feulner explained, "Mother would text threats, she would tell me to go kill myself, I should die, my children should die, she has come to the office and basically verbally attacked every single worker that she's been working with." *Id.*

DHS also presented the testimony of Mother's brother, C.C. Prior to June 2017, C.C. permitted Mother to reside with him in his home. *Id.* at 18. However, C.C. testified that he became concerned with Mother's mental health and that he called the police to have her involuntarily committed. *Id.* C.C. observed Mother "[t]alking to herself, cussing a lot, throwing things around in the room[.]" *Id.* at 19. C.C. also noticed that his kitchen knives were missing. *Id.* at 18-19. The knives were later discovered under Mother's bed. *Id.* C.C. testified that Mother returned to his home the day she was discharged and "got into an incident with my fianc[é]e. . . . fracturing my fianc[é]e's face, breaking her around the cheek bone area." *Id.* at 19-20.

Thus, the record confirms that Mother is incapable of parenting the Children, and that she cannot, or will not, remedy her parental capacity. Mother failed to comply with her SCP objectives, and she is in no position to provide the permanence and stability that the Children require. Mother's poor mental health, and the danger that it may pose to the Children, is particularly troubling. As this Court has stated, "a child's life cannot be held in abeyance

while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

For the same reasons, the record belies any suggestion that the trial court terminated Mother's parental rights due to the ineffectiveness of her trial counsel. ***See T.M.F.*** 573 A.2d at 1044; ***K.D.***, 871 A.2d at 829. Mother received a fair hearing, during which DHS presented overwhelming evidence in support of its termination petition. Our review has uncovered nothing that counsel could have done to preserve Mother's parental rights given the facts of this case.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have

- 12 -

> with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the trial court found that terminating Mother's parental rights will best serve the Children's needs and welfare. Trial Court Opinion, 9/1/2017, at 12. The court reasoned that the Children have no bond with Mother, and will not suffer irreparable harm if her parental rights are terminated. *Id.* The court further reasoned that the Children are bonded with their foster parent. *Id.*

Mother argues that DHS failed to present clear and convincing evidence in support of its petition to terminate her parental rights with respect to Section 2511(b). *Anders* brief at 11. Mother contends that DHS presented very little evidence regarding her relationship with A.B., and that DHS presented no evidence at all regarding her relationship with L.B. *Id.*

We again discern no abuse of discretion. During the hearing, Ms. Feulner testified that CUA offered Mother weekly visits with the Children. N.T., 7/17/2017, at 10. Ms. Feulner was unsure of how many of those visits Mother attended, due to possible omissions in CUA's records. *Id.* at 11. However, she reported that Mother missed six of her last seven visits. *Id.*

- 13 -

Regarding A.B.'s relationship with Mother, Ms. Feulner testified that he "does not interact with mom at all. He kind of just does his own thing during the visits. He is very attached to his resource parents." *Id.* at 12. While visiting with Mother, A.B. asks for "Da da," his pre-adoptive foster parent. *Id.* at 12-13. Ms. Feulner did not "sense a bond" between A.B. and Mother, and she opined that A.B. would not suffer irreparable harm if Mother's parental rights are terminated, due to the strong bond that he shares with his foster parent. *Id.* at 12, 14.

As Mother argues, DHS did not present any testimony regarding L.B.'s relationship with Mother. After DHS presented its testimony regarding A.B., the trial court announced that it had "incorporated by evidence [*sic*] any and all relevant testimony from the matter of [A.B.] into that of [L.B.]" *Id.* at 35. When counsel for DHS indicated that she intended to recall Ms. Feulner in order to present testimony regarding L.B.'s relationship with his foster parent, the court stated, "For what, to get that in? She testified to it on the other child. We incorporated it by reference. It's in the testimony. I already told you that I know it." *Id.* at 41. Ms. Feulner later testified that L.B. resides in the same pre-adoptive foster home as A.B., and that he is doing well in the home. *Id.* at 42.[7]

---

[7] After the court announced its decision to terminate Mother's parental rights, Ms. Feulner added, "Based on [L.B.'s] emotional status with visits with mom he does regress per the therapist." N.T., 7/17/2017, at 58.

- 14 -

Accordingly, the record confirms that terminating Mother's parental rights will best serve A.B.'s needs and welfare. A.B. was removed from Mother's care about two months after his birth. He does not interact with Mother during visits, and there is no indication of a parent/child bond. A.B. is bonded with his pre-adoptive foster parent, and terminating Mother's parental rights will allow A.B. to achieve permanence and stability.

The record also supports the trial court's conclusion that terminating Mother's parental rights will best serve the needs and welfare of L.B. At the outset, we express concern with the court's decision to incorporate by reference Ms. Feulner's testimony regarding A.B.'s relationship with Mother, and to apply that testimony to L.B. It appears that the court simply assumed that Ms. Feulner's testimony would be the same for both Children. However, no one asked Ms. Feulner whether her testimony would be the same, and the parties did not stipulate on the record that her testimony would be the same. Even counsel for DHS seemed to believe that additional testimony regarding L.B.'s needs and welfare would be necessary.

Nonetheless, L.B. has been out of Mother's care since he was a year old. By the time of the hearing, L.B. was over two-and-a-half years old, and had spent the majority of his life in foster care. It is doubtful that L.B. and Mother share a parent/child bond under these circumstances. Even assuming that L.B. and Mother do share a parent/child bond, it is clear that this bond is outweighed by the safety risk that Mother poses to L.B. As noted by the trial

court in its opinion, Mother is an indicated perpetrator of abuse against L.B. Mother also continues to engage in threatening and violent behavior, such as assaulting C.C.'s fiancée. Preserving Mother's parental rights in this case would serve only to deny L.B. the benefits of a permanent and stable home, and to expose him to further risk of harm.

Finally, we consider whether the trial court abused its discretion when it changed A.B.'s permanent placement goal from reunification to adoption.[8] Our standard of review is well-settled.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must

---

[8] While Mother appealed A.B.'s goal change order, her counsel did not raise an issue regarding the order in her *Anders* brief, and the trial court did not discuss it in its opinion. Nonetheless, we address this issue in light of our duty to review the record in search of potentially meritorious issues that counsel may have overlooked. *See Flowers*, 113 A.3d at 1250.

guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

For the reasons discussed above, we conclude that the trial court did not abuse its discretion. Mother remains incapable of parenting A.B., and poses a risk to his safety. A.B. has no bond with Mother, and is bonded with his pre-adoptive foster parent. It is unquestionable that A.B.'s best interest would be served by changing his permanent placement goal from return to parent or guardian to adoption.

Accordingly, our independent review of Mother's claims demonstrates that they do not entitle her to relief. Moreover, our review of the record does not reveal any non-frivolous claims overlooked by counsel. *See Flowers*, 113 A.3d at 1250. We therefore grant counsel's motion to withdraw, and we affirm the July 17, 2017 decrees and order.

Motion to withdraw granted. Decrees affirmed. Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/7/18

- 17 -